Jerry L. DeJESUS, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 308, 1993.

Supreme Court of Delaware.

Submitted: Jan. 10, 1995.
Decided: March 7, 1995.

Diane Clarke Streett, Asst. Public Defender, Office of the Public Defender, Wilmington, for appellant.

Timothy J. Donovan, Jr., Deputy Atty. Gen., Dept. of Justice, Wilmington, for appellee.

Before VEASEY, C.J., WALSH, HOLLAND, HARTNETT, and BERGER, JJ., constituting the Court En Banc.

WALSH, Justice:

In this appeal from the Superior Court, the defendant-appellant, Jerry DeJesus ("DeJesus"), asserts several claims of error arising from his convictions of criminally negligent homicide, felony murder, attempted first degree robbery, and three counts of possession of a deadly weapon during the commission of

a felony. After trial, the Superior Court merged DeJesus' conviction for criminally negligent homicide, and its accompanying weapons conviction, with his felony murder conviction, and its accompanying weapons conviction. DeJesus was then sentenced to life imprisonment for the felony murder conviction and six years imprisonment for his remaining three convictions.

On appeal, DeJesus contests the admissibility of his pretrial statements to the police, the State's ability to establish the *corpus delicti* of the attempted robbery charge, and several discretionary and evidentiary rulings rendered by the court during trial. We have reviewed DeJesus' claims regarding his pretrial statements and the rulings of the court during trial and find them without merit. However, after a thorough review of the record, we have concluded that the State failed to establish, *aliunde* the defendant's confession, the *corpus delicti* of attempted robbery. Because the attempted robbery charge was the predicate felony for DeJesus' felony murder conviction, we conclude that his convictions for both charges must be reversed. We therefore vacate DeJesus' convictions for felony murder, attempted robbery and the two accompanying weapons offenses. We affirm his convictions for criminally negligent homicide and its accompanying weapons offense, and thus remand to the Superior Court for resentencing the convictions of criminally negligent homicide and possession of a deadly weapon during the commission of a felony.

I

At trial the State presented evidence of the following events. Charles Craig ("Craig"), a retired policeman, testified that on November 21, 1991, at approximately 1:30 p.m., while parking his car on the 900 block of Tatnall Street in Wilmington, he observed a blue Honda automobile parked in front of him. He then saw a person he later identified as DeJesus exit the Honda from the passenger side, enter a nearby bank, and return to the car three to five minutes later. The Honda then backed up, stopped abrupt-

ly, and began to rock violently, as if the occupants were engaged in a struggle. Although Craig could see arms moving within the car, he could not discern who initiated the altercation because the rear window of the car was fogged over.

At that point, Craig left his vehicle and approached the Honda where he saw the driver of the automobile slumped with his head and torso across the passenger seat. The driver, later identified as Lawrence Robinson ("Robinson"), was bleeding from a neck wound and appeared unconscious. Meanwhile, the passenger, DeJesus, was attempting to climb into the driver's seat, apparently to start the car. Craig then asked the passenger what had happened and DeJesus replied that he had been stabbed. DeJesus then opened the driver's side door and walked to the sidewalk where he sat down and asked for help. Craig noticed that DeJesus was wearing a pair of work gloves over another pair of surgical gloves. DeJesus removed the gloves, examined his stab wound and collapsed on the sidewalk.

The police and paramedics were summoned to the scene shortly thereafter. Officer Gregory Ciotti ("Officer Ciotti") arrived on the scene and saw DeJesus on the sidewalk where he was bleeding and shouting that the driver had stabbed him.[1] Officer Ciotti rushed Robinson to the hospital in a patrol cruiser. Robinson died at the hospital, where hospital staff found one hundred dollars in his pocket. DeJesus was also taken to the hospital by ambulance and later underwent surgery for a lacerated colon.

During the struggle in the car, DeJesus had been stabbed once in the side of his abdomen. Robinson had been stabbed twice, once in the neck and once in the torso. Inside the Honda, the police found a steak knife and a white powdery substance, which tested negative as an illegal substance. The steak knife appeared to be the sole instrument that caused all three wounds to DeJesus and Robinson. The medical examiner opined that of the two wounds to Robinson, the wound to the neck was inflicted first

---

1. DeJesus, a native of Puerto Rico, evidently spoke Spanish as his primary language, yet he expressed himself in English during this entire incident.

because it appeared as if it had been partially blocked. This stab wound punctured the internal subclavian artery of the neck, which, according to the medical examiner's estimation, would have incapacitated Robinson within a matter of seconds or minutes. Therefore, he concluded that there was only a one percent chance that Robinson could have received this injury, and then have the strength to disarm and stab his attacker in the abdomen. He surmised that either wound to Robinson, however, would have proven fatal.

DeJesus was hospitalized for one week as a result of his injuries. During the course of his hospitalization, DeJesus made three statements to the police. Two statements were made on the day of the incident. DeJesus first made a statement to Detective Leon Stevenson ("Detective Stevenson"), who was dispatched to the emergency room as part of the police investigation of the incident. When Detective Stevenson arrived at the emergency room, he noticed the medical staff attempting to stabilize DeJesus in preparation for surgery. He knew little about the incident other than that DeJesus had been stabbed. Once DeJesus was stabilized, Detective Stevenson received permission from medical staff to question DeJesus. DeJesus was lying on a hospital gurney and appeared to be in great pain.

Detective Stevenson then identified himself and DeJesus quickly told him that "I got stabbed and stabbed him [Robinson] back." Although DeJesus was not viewed as a suspect of a crime at that time, Detective Stevenson recited to DeJesus the *Miranda* warnings from memory, albeit he neglected to inform DeJesus of his right to an attorney. Detective Stevenson then asked DeJesus if he wished to speak to him and DeJesus replied that he did.

DeJesus then elaborated on his initial declaration by saying that his friend, Robinson, picked him up that day on his lunch break to take DeJesus to cash his paycheck. After cashing his paycheck at the Wilmington Trust, DeJesus asked Robinson to drive him to another bank on Tatnall Street so that he could meet his friend Hector Hernandez ("Hernandez"). Robinson complied. After

failing to locate Hernandez at the bank, DeJesus returned to the car. DeJesus claimed that as soon as he sat in the car, Robinson stabbed him in his abdomen to steal the money DeJesus received from his paycheck. The two men then struggled and DeJesus was able to stab Robinson in the neck and then in the torso. DeJesus then told the detective that he either fell out of the car or someone opened the door and carried him out. After this brief statement, DeJesus was taken into surgery. According to Detective Stevenson, although DeJesus was visibly in pain, he had no difficulty expressing himself.

DeJesus was next questioned by police detectives Martin Donahue ("Detective Donahue") and William Brown ("Detective Brown") while he was in the recovery room following the operation, about six hours after the stabbings occurred. The detectives did not give DeJesus *Miranda* warnings because DeJesus was viewed as a crime victim rather than a suspect based on his statement to Detective Stevenson. After receiving permission from a hospital surgeon, the detectives interviewed DeJesus. Upon asking a few preliminary questions, the detectives believed that DeJesus was conscious and coherent enough to give another statement regarding the stabbings.

Elaborating on his first statement, DeJesus told the detectives the following: he called Robinson the previous night to pick him up from work on his lunch break because DeJesus' car was not running properly. That afternoon, the men went to the Wilmington Trust on Market Street where DeJesus cashed his paycheck for $160.00. Robinson then drove DeJesus to his mother's house, where DeJesus paid his mother $60 in rent. DeJesus then told Robinson that he would take Robinson out to lunch if he would drive him to the bank on Tatnall Street to meet his friend Hernandez. He told the detectives that he had lunch plans with Hernandez so that they could discuss Hernandez's upcoming marriage. During the ride to the bank, Robinson told DeJesus that he had half an ounce of marijuana and a "quarter" of cocaine in the car. Robinson then drove to Tatnall Street where DeJesus looked for Hernandez. Robinson remained in the car.

When he could not find Hernandez, DeJesus came back to the Honda and Robinson immediately stabbed him. The two men struggled, and DeJesus was able to gain partial control of the knife to stab Robinson twice. DeJesus also stated that, during the struggle, Robinson was able to remove one hundred dollars from DeJesus' pocket.

Five days later, DeJesus requested that Detectives Donahue and Brown return to the hospital. The detectives arrived at around 6:20 p.m. and saw that DeJesus had two visitors in his hospital room. The detectives did not administer *Miranda* warnings to him at that time. DeJesus then made a third statement which was somewhat inconsistent with his prior statements to the police.

During this statement, DeJesus told the detectives the following: during his lunch break he drove his own car to the Wilmington Trust to cash his paycheck. Outside the bank, he saw Robinson and another man he knew. DeJesus drove the third man to a residence, while Robinson followed in his car. DeJesus then paid his rent and went to the home of Jeannie Rojas ("Rojas"). Robinson again followed. DeJesus then said that he left his car at Rojas' residence and departed in Robinson's Honda. Robinson then drove DeJesus to the Tatnall Street location so that DeJesus could meet his friend Hector "Ruiz" or "Russini." When DeJesus returned to the car, Robinson began harassing him about why he took so long. DeJesus then said, "Just shut the . . . up and drive." At that point, Robinson pulled the knife and stabbed him, but DeJesus was able to gain partial control of the knife to stab Robinson twice in self-defense. Again, DeJesus said that Robinson was able to remove one hundred dollars from DeJesus' breast pocket during the struggle.

Following this statement, the detectives asked DeJesus if he would come to the police station for a formal, taped interview. It was arranged that DeJesus would make a formal statement at the police station the following Saturday. On Friday, the day DeJesus was released from the hospital, Detective Donahue saw DeJesus while driving by his house. Detective Donahue stopped and conversed with DeJesus' briefly, confirming with him the time and place for DeJesus' interview the following day.

On Saturday, around three o'clock in the afternoon, DeJesus' relatives drove him to the police station. Detectives Brown and Donahue were the only police officers present for the statement, which was recorded on both an audio and video recorder. The statement began around 3:15 p.m. At the beginning of the statement, DeJesus was advised of his *Miranda* warnings by Detective Brown. DeJesus responded that he understood the rights explained to him and that he wished to give a statement.

DeJesus then related a story virtually identical to the story given to the detectives during the three interviews the preceding week, *i.e.*, that Robinson stabbed him first to rob him and that he stabbed Robinson in self-defense. The detectives then raised several inconsistencies in his various statements and asked DeJesus if he wished to change his account. DeJesus responded that he was not going to alter the story from the version which he gave at the hospital. After about forty-five minutes of questioning, the interrogation appeared to conclude and the video and audio recorders were turned off.

According to the detectives, they confronted DeJesus at that time with additional inconsistencies in his story and told him that they believed that he was lying to them. The detectives confronted DeJesus with a recorded message from Robinson's telephone answering machine in which DeJesus arranged the November 22nd meeting to purchase drugs. The detectives testified that DeJesus then told them that he wanted to tell the truth about the stabbings. The recorders were then turned on again, six minutes after they were shut off.

DeJesus then told the detectives a very different story. He confessed that he stabbed Robinson first and that his motive was robbery. He proceeded to recount that he had telephoned Robinson, a drug dealer, the day before the incident and had ordered some marijuana which he intended to rob from him. DeJesus stated that he intended to sell the marijuana to obtain cash to pay for some existing fines and court costs, as well as

other costs he anticipated receiving for a charge of hindering prosecution then pending in the Municipal Court. He told the detectives that he armed himself with a knife which he obtained from the kitchen area of his place of employment, and that he wore the rubber gloves to prevent his fingerprints from being left at the scene. DeJesus also stated that he owed Robinson $183.00 and that he wished to eliminate that debt by murdering Robinson.

DeJesus told the detectives that he met Robinson at the Wilmington Trust during his lunch hour. DeJesus dropped his car off at the Rojas residence and left in Robinson's Honda. DeJesus then gave Robinson one hundred dollars and the men went to the bank at Tatnall Street. DeJesus was to cash another check and give Robinson the remaining money he owed him. DeJesus had no such check. Once DeJesus returned to the car from the bank, Robinson asked for the money and an argument ensued. DeJesus then reached down and grabbed the knife which he had earlier placed on the floor of the car. DeJesus then stabbed Robinson in the neck and the chest. Robinson was able to gain control of the knife from DeJesus during the struggle, however, and he stabbed DeJesus in the abdomen.

DeJesus was arrested immediately following this recorded statement. He was later indicted on two counts of first degree murder (one count intentional murder and one count felony murder), three counts of possession of a deadly weapon during commission of a felony, and one count of first degree attempted robbery. The jury found DeJesus guilty of six crimes: criminally negligent homicide as a lesser included offense of intentional murder, felony murder, attempted robbery, and three counts of possession of a deadly weapon during the commission of a felony.

After trial, DeJesus filed a motion for judgment of acquittal notwithstanding the verdict. Although the Superior Court denied the motion, it did merge DeJesus' conviction for criminally negligent homicide, and its accompanying weapons conviction, into his felony murder conviction, and its accompanying weapons conviction.

## II

Prior to trial the defense moved to suppress the statements made by DeJesus at the hospital, as well as his taped confession at the police station. After an evidentiary hearing, the Superior Court denied DeJesus' motion and his statements were admitted at trial. On appeal, DeJesus asserts the court erred in concluding that: (1) *Miranda* did not apply to his first three statements because DeJesus was not in "custody" during his statements at the hospital; (2) DeJesus waived his *Miranda* warnings at the police station; (3) DeJesus did not assert his right to silence; and (4) DeJesus' statements were voluntary. We address these claims *seriatim*.

### A.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege against self-incrimination governs state as well as federal criminal proceedings through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Malloy v. Hogan*, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court extended the privilege to the in-custody interrogation of a person accused or suspected of a crime. *Id.* at 467, 86 S.Ct. at 1624. *Miranda* recognized that the interrogation of a suspect in a custodial setting frequently contains "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Minnesota v. Murphy*, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624). Consequently, law enforcement officials may not subject an individual to custodial interrogation unless he is advised of specific rights protective of his privilege against compelled self-incrimination guaranteed by the Fifth Amendment. *Miranda*, 384 U.S. at 466, 86 S.Ct. at 1623–24;

*Marine v. State,* Del.Supr., 607 A.2d 1185, 1192 (1992), *cert. dismissed,* — U.S. —, 113 S.Ct. 28, 120 L.Ed.2d 952 (1992).

■ The now-familiar *Miranda* warnings were designed "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625. If the police take a suspect into custody, and interrogate him without advising him of his fifth amendment rights, his answers cannot be introduced into evidence at a subsequent trial to establish the suspect's guilt. *Berkemer v. McCarty,* 468 U.S. 420, 429, 104 S.Ct. 3138, 3144, 82 L.Ed.2d 317 (1984).

■ However, a law enforcement officer becomes obligated to administer *Miranda* warnings "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California,* — U.S. —, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977) (*per curiam*). The legal standard used to determine "custody" for purposes of *Miranda* has been clearly delineated. "[T]he ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury,* — U.S. at —, 114 S.Ct. at 1529; *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (*per curiam*); *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *see also Minnesota v. Murphy,* 465 U.S. at 430–31, 104 S.Ct. at 1143–44; *Berkemer v. McCarty,* 468 U.S. at 439–41, 104 S.Ct. at 3150; *Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976); *Marine,* 607 A.2d at 1192–93; *Chao v. State,* Del.Supr., 604 A.2d 1351, 1355 (1992).

■ When determining whether an interrogation has occurred in a custodial setting, thus evoking the need for *Miranda* warnings, the court must review the "totality of the circumstances" surrounding the interrogation by applying an objective, reasonable person standard. *Marine,* 607 A.2d at 1193; *see also Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (setting forth a similar test to determine whether an individual has been seized). A determination of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury,* — U.S. at —, 114 S.Ct. at 1529. Unlike a subjective test, an objective, reasonable person standard "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does [it] place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question." *Marine,* 607 A.2d at 1193 (quoting *United States v. Phillips,* 11th Cir., 812 F.2d 1355, 1359–60 (1987), *see also Berkemer v. McCarty,* 468 U.S. at 442 n. 35, 104 S.Ct. at 3151 n. 35.

At the suppression hearing, DeJesus contended that he was in custody during each of the three interviews that occurred in the hospital.[2] He claimed that he was not free to leave the hospital at any time during the interrogations, that the police approached him in an overpowering demeanor, and that his low intelligence, poor English comprehension and the influence of pain-killer medication did not allow him to fully comprehend the nature of his interaction with the police.[3] DeJesus asserted that a rational person in his position would have considered his deprivation of freedom so severe as to constitute custody which, *a fortiori,* required the police to recite the *Miranda* warnings before questioning him. Because the police failed to

2. The State did not dispute that each interview constituted an "interrogation" as defined under *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

3. At the suppression hearing, Dr. Pedro Ferreira, a psychologist, testified that DeJesus was mildly retarded with an intelligence quotient of 71. He also testified that DeJesus has poor English comprehension skills and may appear to participate in a conversation in English when he does not know what he is talking about. He further testified that DeJesus does not function well in stressful situations, clings to authority, and is psychologically compelled to answer questions from authority figures because of the nature of his Hispanic upbringing and heritage.

*Mirandize* him at the hospital properly, De-Jesus argues that these statements, as well as his subsequent confession at the police station, were inadmissible at trial to show his guilt. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *but cf. Oregon v. Elstad,* 470 U.S. 298, 314, 105 S.Ct. 1285, 1296, 84 L.Ed.2d 222 (1985) (though *Miranda* requires suppression of unwarned statement, admissibility of any subsequent statement depends upon whether statement is knowingly and voluntarily made).

The Superior Court rejected these arguments at the suppression hearing, finding that:

> After reviewing the totality of the circumstances of the case, the Court finds that Defendant was not in custody when he made Statements 1, 2 or 3. At no time did the police attempt to physically restrain him. The police did not place guards outside of Defendant's door, the normal practice for persons "in custody" at a hospital. More importantly, using the standard of a reasonable man, the questioning by the police while in the hospital does not rise to the degree of custody normally associated with arrest. While Defendant was not free to leave the hospital because of his severe medical problems, Defendant was not placed in a position in which a reasonable man would have inferred that he was not free to demand that the police cease questioning him. In making this finding, the Court is relying heavily on the Delaware Supreme Court's decision in *Marine* in which the court stated that the "frailties and idiosyncracies" of the individual being questioned were not major factors in the totality analysis. *See Marine,* 607 A.2d at 1193. The Court finds that, despite his low I.Q., Defendant has sufficient comprehension of the English language to understand what was happening to him, and thus not "in custody" while in the hospital.

■ Our standard of review of the Superior Court's finding that DeJesus was not in custody during his three statements given at the hospital is well established. "A determination of whether a defendant is in custody for *Miranda* purposes, being a question of

fact for a trial court to make, will be sustained by an appellate court unless clearly erroneous." *Marine,* 607 A.2d at 1194; *see also Albury v. State,* Del.Supr., 551 A.2d 53, 60 (1988); *Martin v. State,* Del.Supr., 433 A.2d 1025, 1033 (1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982); *State v. Rooks,* Del.Supr., 401 A.2d 943, 949 (1979).

■ Under this deferential standard, we must reject DeJesus' contention that the Superior Court's finding as to custody was clearly erroneous. As we have held previously, there is no *per se* "hospital rule" in a custody inquiry because each case must be decided on its own facts. *Hammond v. State,* Del.Supr., 569 A.2d 81, 93–94 (1989). Here, the facts clearly indicate that DeJesus was not formally arrested or deprived of his freedom in any significant way. *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. While DeJesus' freedom of movement was undoubtedly restricted throughout his hospitalization, his confinement was caused by his own physical incapacity—*not* police compulsion. At no time did the police attempt to physically restrain DeJesus: he was not handcuffed, nor did the police guard his hospital room to prevent his escape. Further, the detectives did not impede DeJesus' release from the hospital. Rather, DeJesus left on his own accord.

■ During his week-long hospital stay, the police came into contact with DeJesus only three times—the third meeting at his own request. Throughout this period, the detectives exhibited no behavior indicating that DeJesus was either under arrest or a suspect to a crime. Although the detectives came to view DeJesus as a suspect by the time of his third statement, they did not communicate their suspicion to him. Such undisclosed suspicions are irrelevant in the assessment of whether a person was in custody. *Stansbury,* —— U.S. at ——, 114 S.Ct. at 1527–29. Because the interrogations were noncustodial, *Miranda* is inapplicable, even if DeJesus was questioned in a slightly coercive environment. *Chao,* 604 A.2d at 1355–56. Therefore, we affirm the Superior Court's ruling that the hospital statements were admissible, notwithstanding the detectives' fail-

ure to properly administer the *Miranda* warnings, because DeJesus was never in custody during these statements.

### B.

DeJesus next contends that the State failed to establish that his confession at the police station was the product of a knowing and intelligent waiver of his *Miranda* rights. It is not contested that Detective Brown fully advised DeJesus of his *Miranda* rights at the police station and that DeJesus appeared to waive them. Rather, DeJesus argues that his waiver was ineffective because, *inter alia,* his limited mental capacity adversely affected his ability to understand the import of a decision to forego his rights.[4]

▣ It is well settled that an accused may waive the rights protected by *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612; *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987); *Marine,* 607 A.2d at 1195. The State has the burden of proving, by a preponderance of the evidence, that an individual duly waived his *Miranda* rights. *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). The issue of waiver is not merely a question of "form." Rather, the determination is made "upon an inquiry into the totality of circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have assistance of counsel." *Fare v. Michael C.,* 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979). The inquiry has two distinct dimensions:

**First,** the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. **Second,** the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal [sic] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* warnings have been waived.

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (emphasis added).[5]

▣ DeJesus argues that the trial court erred in its findings as to both inquiries of the waiver issue. As to the first inquiry, DeJesus claims that his limited intelligence, physical condition, and cultural background combined to render his waiver involuntary. DeJesus' assertion that his personal characteristics affected the voluntariness of his waiver, however, is misplaced. The "voluntariness" of the waiver inquiry is limited to the existence of State misconduct or overreaching. "The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly,* 479 U.S. at 170, 107 S.Ct. at 523. It does not concern "moral or psychological pressures to confess *emanating from sources other than official coercion.*" *Id.* (quoting *Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1290, 84 L.Ed.2d 222 (1985)) (emphasis added); *see also Shipley v. State,* Del.Supr., 570 A.2d 1159, 1168 (1990). The "voluntariness" of a waiver of *Miranda* rights depends

---

4. The Superior Court concluded that the first part of the questioning at the police station was noncustodial because DeJesus went to the police station voluntarily for questioning and to give a statement. *See California v. Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520; *Oregon v. Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714; *see also Hanna v. State,* Del.Supr., 591 A.2d 158, 165 (1991). In any event, the court found that even if DeJesus was in custody at this point, the police nonetheless fulfilled their obligations under *Miranda* by reading DeJesus his rights prior to the interrogation.

5. Our reliance on *Moran* in this case is limited to the two-prong test crafted by the Supreme Court to test the efficacy of waiver. In *Moran,* the United States Supreme Court in a separate ruling "refused to adopt a rule requiring police to inform a suspect of an attorney's efforts to reach him." *Bryan v. State,* Del.Supr., 571 A.2d 170, 177 (1990). We accepted the Supreme Court's invitation in this latter ruling to adopt a more stringent rule under the Delaware Constitution. *See id.* Our reliance on *Moran* today is directed to a different issue and is not intended to modify our holding in *Bryan.*

entirely upon the absence of police over-reaching, and not upon an abstract inquiry into the defendant's "free will" or subjective view of reality. *Colorado v. Connelly,* 479 U.S. at 170, 107 S.Ct. at 523 (citing *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141; *Fare v. Michael C.,* 442 U.S. at 726–27, 99 S.Ct. at 2672–73); *Liu v. State,* Del.Supr., 628 A.2d 1376, 1379–80 (1993).

■■■ "Absent evidence that [DeJesus'] will was overborne and his capacity for self-determination critically impaired because of coercive police conduct, his waiver of his Fifth Amendment was voluntary under th[e] Court's decision in *Miranda.*" *Colorado v. Spring,* 479 U.S. at 574, 107 S.Ct. at 857; *see also Liu v. State,* 628 A.2d at 1380. DeJesus has not proffered evidence of police miscon-duct and does not argue that he was "worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit." *Fare v. Michael C.,* 442 U.S. at 726–27, 99 S.Ct. at 2572–73. Further, while the detec-tives confronted DeJesus during the six min-ute break with the inconsistencies in his sto-ry and other evidence they discovered, they did not "resort[ ] to physical or psychological pressure to elicit the statements," *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141, nor did they "intimidate or threaten [him] in any way." *Fare v. Michael C.,* 442 U.S. at 727, 99 S.Ct. at 2573. When asked by the detectives as to the circumstances of his statement, DeJesus responded that he was at the police station under his own free will and that no one had threatened him to give a statement. Finally, the Superior Court con-cluded from the videotape that DeJesus was "willing" and "eager" to cooperate with the police. Under the circumstances, therefore, we find that the Superior Court properly held that DeJesus' waiver of his *Miranda* rights was voluntary as the result of an "uncoerced choice."

■■■ As to the second inquiry, DeJesus argues that he neither comprehended the panoply of his *Miranda* rights nor the conse-quences of a decision to relinquish them. Thus, he argues, his waiver was not made with "the requisite level of comprehension" to be effective. DeJesus contends that his limited intelligence and his lack of under-standing of the English language, as well as his use of prescribed pain-killers, precluded him from making an intelligent waiver of his *Miranda* rights at the time he gave his state-ment at the police station.

The Superior Court, after reviewing both DeJesus' recorded statement and the testi-mony presented before it, concluded that the *Miranda* warnings were thoroughly ex-plained to DeJesus. The court further found that DeJesus acknowledged the warnings and knowingly waived his rights under them. After viewing the videotape, the court con-cluded that DeJesus' "comprehension of En-glish was sufficient to permit him to give lucid and coherent responses to the ques-tions."

We find the Superior Court to have con-ducted a careful evaluation of DeJesus' waiv-er in the context of the totality of the circum-stances. *Marine,* 607 A.2d at 1198. The court's conclusion that DeJesus knowingly and intelligently waived his *Miranda* rights is amply supported by the record. The de-tectives fully explained the basis for the questioning, and informed DeJesus of his rights delineated in *Miranda* and the conse-quences of a decision to forgo those rights. Additionally, the detectives ascertained that DeJesus understood the rights explained to him.

■■■ Moreover, the Fifth Amendment does not guarantee a person a fully informed choice in a decision to waive *Miranda* rights. *Colorado v. Spring,* 479 U.S. at 574, 107 S.Ct. at 857; *Shipley,* 570 A.2d at 1168. DeJesus has failed to show that his low intelligence prevented him from comprehending the plain meaning of his basic *Miranda* rights. *Liu,* 628 A.2d at 1380–81; *accord Mathenia v. Delo,* 8th Cir., 975 F.2d 444, 448 (1992), *cert. denied,* —— U.S. ——–——, 113 S.Ct. 1609–10, 123 L.Ed.2d 170 (1993) (despite having mild mental retardation and intelligence quo-tient of only 70, circumstances surrounding confession demonstrated that defendant pos-sessed "the requisite level of comprehension" to waive his *Miranda* rights). While DeJe-sus' cultural heritage is "certainly one of the many circumstances ... which may shape awareness of one's constitutional rights,"

nevertheless, his waiver must be tested by an objective standard. *Liu,* 628 A.2d at 1381. Here, the totality of the circumstances indicates that DeJesus' decision to waive his *Miranda* rights was not compromised by his cultural heritage. *Id.* Finally, DeJesus' claim that he had a limited understanding of the English language was directly rebutted by the testimony of several witnesses, as well as his own videotaped statement. Each indicated that DeJesus comprehended the English language sufficiently to engage in a coherent conversation with others. In short, there is no indication in the record that DeJesus failed to comprehend the substance of what the detectives told him. The factual findings of the trial court are supported by competent evidence and are not clearly erroneous. Consequently, they are binding on this Court and will not be disturbed on appeal. *Albury,* 551 A.2d at 60.

In conclusion, the record fully supports the required dual findings that: (1) the relinquishment of DeJesus' rights was the product of a free and deliberate choice, free of official coercion; and (2) DeJesus' waiver was made with full awareness of the nature of the rights being abandoned and the consequences of its abandonment. *Moran v. Burbine,* 475 U.S. at 421, 106 S.Ct. at 1141; *Marine,* 607 A.2d at 1199.

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Moran v. Burbine,* 475 U.S. at 422–34, 106 S.Ct. at 1141. Accordingly, we affirm the Superior Court's denial of DeJesus' motion to suppress his statement at the police station on the basis that his *Miranda* rights were knowingly, intelligently, and voluntarily waived.

## C.

DeJesus next claims that the detectives did not scrupulously honor his decision to remain silent and that they likewise failed to issue fresh *Miranda* warnings following the break in recorded questioning at the police station. The Superior Court determined that the interrogation of DeJesus became custodial at some point during the six minute break in the questioning at the police station. During this time, the detectives confronted DeJesus with the inconsistencies in his story and the evidence they had obtained against him to accuse DeJesus of lying to them. The court held that a reasonable person in DeJesus' position would have felt that he was not free to leave at that point. *See Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. We agree.

DeJesus contends that, assuming his waiver was effective during the first part of the statement given at the police station, the break in the questioning, combined with his purported invocation of his right to silence, either precluded the detectives from questioning him further, or required them to issue fresh *Miranda* warnings. Because the police neither scrupulously honored his right to remain silent, nor read to him fresh *Miranda* warnings after the break, DeJesus contends that his post-break confession is inadmissible.

 We first address DeJesus' contention that he invoked his right to silence. *Miranda* requires that law enforcement officials not only inform a person in custody of his Fifth Amendment rights, but also that they respect his decision to exercise the rights delineated in the warnings. *Moran v. Burbine,* 475 U.S. at 420, 106 S.Ct. at 1140. Thus, when an accused invokes his right to silence, the police may not initiate further questioning on the crimes at issue. *Id.; Dodson v. State,* Del.Supr., 513 A.2d 761, 763 (1986). "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease." *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627. The invocation of the right to silence by an accused, however, does not permanently prohibit subsequent interrogation. Rather, the Supreme Court has concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored."

*Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975) (footnote and internal quotation marks omitted); *accord Dodson*, 513 A.2d at 763.

■ DeJesus claims that he wished to end the questioning and that he communicated his intention to the detectives several times prior to the break in the recorded questioning.[6] DeJesus concedes that he never explicitly invoked his right to silence. Nonetheless, he argues that his responses to the questions posed to him indicate, perhaps inartfully, his desire to terminate the interrogation and invoke his right to silence. The Superior Court, after reviewing the videotape and its transcript, concluded that DeJesus did not invoke his right to silence. Although it recognized that a suspect may express his desire to terminate questioning by other than express language, the court found that DeJesus neither impliedly nor expressly indicated that he wished to remain silent.

■ The court's finding is entirely correct. Indeed, we rejected a very similar argument in *Brooks v. State*, Del.Supr., 229 A.2d 833 (1967). Similar to the case *sub judice*, the defendant in *Brooks* maintained his innocence after a prolonged custodial interrogation and indicated to the police that he did not wish to answer any questions differently than he had already answered. On appeal, he argued that his responses were equivalent to a request to terminate the interrogation and an invocation of his right to remain silent. Although we recognized that a desire to end questioning may be accomplished by other than express language, *id.*, 229 A.2d at 836, we concluded that the defendant's behavior, under the circumstances, did not warrant this conclusion. Such is the case here. Although DeJesus repeatedly indicated that he was unwilling to change his story, he never communicated to the detectives that he desired to terminate the interrogation. DeJesus' statement that he was remaining steadfast to his story is not tantamount to an assertion of his right to remain silent. The

court's finding, amply supported by competent evidence, is therefore affirmed.

■ Alternatively, DeJesus claims that the detectives were obligated to reissue *Miranda* warnings following the break in the interrogation at the police station. It is argued that the brief recess required the detectives to advise DeJesus again of his rights under *Miranda*. This Court has adopted a five-part test to determine whether police are obligated to repeat once-administered *Miranda* warnings. These factors include:

(1) the time lapse between the last *Miranda* warnings and the accused's statements;

(2) interruptions in the continuity of the interrogation;

(3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the accused's statement was made;

(4) whether the same officer who gave the warnings is also conducting the interrogation resulting in the accused's statement; and

(5) whether there is a significant difference between statement elicited during the interrogation being challenged and other preceding statements.

*Ledda v. State*, Del.Supr., 564 A.2d 1125, 1130 (1989); *see also Commonwealth v. Wideman*, 460 Pa. 699, 334 A.2d 594, 598 (1975) *State v. Birmingham*, Me.Supr., 527 A.2d 759, 761–62 (1987). In *Ledda*, this Court held that *Miranda* warnings were not required to be given to a suspect a second time where the same police officer who administered the warnings at a traffic stop also elicited a statement from the defendant two hours later at the police barracks.

■ After carefully considering the five factors listed in *Ledda*, we believe that the detectives were not obligated to readminister *Miranda* warnings to DeJesus following the six minute break in the recorded questioning. First, the post-break confession came just

---

6. We need not address the defendant's right to counsel during questioning because at no time during the interrogation did DeJesus request to speak to an attorney. *See Davis v. United States,*

— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

one hour after Detective Brown read DeJesus his *Miranda* warnings. Second, the six-minute "interruption" in the continuity of the questioning was relatively brief. Third, the questioning took place in the same room in which DeJesus received his *Miranda* warnings. Fourth, Detective Brown, who issued DeJesus his *Miranda* warnings, was not only present, but was a central participant in the entire interrogation that resulted in DeJesus' confession. Finally, while DeJesus' confession differed significantly from his preceding statements, we are convinced that his confession was the result of a properly conducted interrogation. *See Birmingham*, 527 A.2d at 762. Under these circumstances, we conclude that the *Miranda* warnings DeJesus received when he arrived at the police station obviated any requirement that DeJesus be subsequently issued warnings after the break. *See also United States v. Springer*, 7th Cir., 460 F.2d 1344 (1972).

### D.

We now address DeJesus' remaining claim of error arising from the suppression hearing. DeJesus argues that, independent from the requirements of *Miranda*, all of his statements were inadmissible because they were involuntary. It is contended that DeJesus' personal characteristics, including his physical and mental condition at the hospital and at the police station, permitted the police to "overbear" his will so that none of his statements were the product of a rational intellect and free will. *Marine*, 607 A.2d at 1199. DeJesus argues that the progression of coercive police activity in the hospital and at the police station culminated in his will being overborne.

▪▪▪▪ Courts have long recognized that a statement obtained by police which is not the product of a voluntary choice by the defendant is inadmissible against him under the Due Process Clause of the Fourteenth Amendment. *Brown v. Mississippi*, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). The due process approach has survived the holding in *Miranda* and remains an independent consideration when reviewing the admissibility of statements made by defendants to law enforcement officials. *Colorado v.*

*Connelly*, 479 U.S. at 163, 107 S.Ct. at 519–20. This approach recognizes that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985).

▪▪▪▪ The question of voluntariness is a factual issue to be determined under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *Marine*, 607 A.2d at 1199; *Shipley v. State*, Del.Supr., 570 A.2d 1159, 1168 (1990). The relevant inquiry in each case is whether the defendant's will was overborne when the statement was elicited. *Shipley*, 570 A.2d at 1168; *Baynard v. State*, Del.Supr., 518 A.2d 682, 690 (1986). A voluntariness inquiry requires the reviewing court to evaluate the specific tactics used by the police in eliciting the statements, the details of the interrogation, and the characteristics of the defendant. *Baynard*, 518 A.2d at 690. The prosecution must prove by a preponderance of the evidence that a confession sought to be used at trial was voluntary. *Lego v. Twomey*, 404 U.S. 477, 488, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *State v. Rooks*, Del.Supr., 401 A.2d 943, 949 (1979). In our review, however, we view the evidence in the light most favorable to the State. *Marine*, 607 A.2d at 1199.

In the present case, after reviewing both the videotape of DeJesus' statement and the testimony before it, the Superior Court found that the police used no threats and merely confronted DeJesus with inconsistencies in his previous statements. DeJesus contends that the court's finding that his confession was voluntary is not supported by substantial, competent evidence. He asserts that the record requires a finding that his free will was overborne by the police. In support of his argument, DeJesus refers to essentially the same factors which he claims rendered his waiver of *Miranda* rights involuntary, *i.e.*, his limited intelligence, his physical condition following the stabbing, the pain-killer medication he was taking, his Hispanic background, and his poor command of the En-

glish language, all combined to subjugate his will to resist police interrogation while both in the hospital and the police station, thus rendering all his statements involuntary.

■■■ The fundamental flaw in this argument is that it refers to no evidence of police coercion during the interrogation which rises to the level of "overreaching" or outrageous behavior. It is well settled that, for a statement to be found involuntary, the court must find that it was the result of "'coercive government misconduct' which is causally related to the [statement]." *Marine*, 607 A.2d at 1199 (quoting *Colorado v. Connelly*, 479 U.S. at 163, 107 S.Ct. at 520) ("absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law"). While the physical or mental condition of the accused remains a pertinent concern as it relates to his vulnerability to government coercion, "mere examination of the confessant's state of mind can never conclude the due process inquiry." *Colorado v. Connelly*, 479 U.S. at 165, 107 S.Ct. at 521. Rather, the psychological and physical condition of the accused are significant in the "voluntariness calculus" only to the extent that the police exploit such characteristics to elicit incriminating statements from him.[7] Coercive police activity is a "necessary predicate" for a due process violation. *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. at 522. *See also United States v. Rohrback*, 8th Cir., 813 F.2d 142, 144, *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987) ("*Connelly* makes it clear that such personal characteristics of the defendant are constitutionally irrelevant absent proof of coercion brought to bear on the defendant by the State").

■■ It is manifest from the record that the police did not exert coercive pressure to overbear the free will of DeJesus. During his interrogation at the police station, DeJesus was asked whether he was threatened or coerced into giving a statement and he replied in the negative. The detectives were cordial throughout the questioning and made no visible attempts to exploit his particular idiosyncracies in order to elicit incriminating statements. Although the detectives utilized the time when the tape was shut off to confront DeJesus with inconsistencies in his statement and the existence of evidence which supposedly implicated him in a crime, this behavior by the police is not tantamount to coercion.[8] Therefore, we have found no evidence of improper police conduct during DeJesus' statement at the police station sufficient to rebut the trial court's findings that there was no coercion. We thus affirm such findings as supported by the record and not clearly erroneous. *Marine*, 607 A.2d at 1199–1200; *Albury*, 551 A.2d at 60; *Baynard*, 518 A.2d at 690–91. DeJesus's arguments contesting the trustworthiness of his confession concern the weight of the evidence, not its admissibility.

Nonetheless, DeJesus further claims that the trial judge ruled only on the voluntariness of the fourth statement (the one given at the police station) and neglected to address voluntariness with respect to the first three statements. DeJesus claims that his hospital statements were involuntary, thus rendering his confession inadmissible as an illegal product of the tainted statements. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 471, 9 L.Ed.2d 441; *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84

7. Courts generally have refused to consider the mental conditions of the suspect, even those which render him highly susceptible to suggestion, in the absence of either physical or psychological coercion by the government authority. *See, e.g., Bell v. Lynaugh*, 5th Cir., 828 F.2d 1085, *cert. denied*, 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987); *United States v. Gordon*, W.D.La., 638 F.Supp. 1120 (1986), *aff'd*, 5th Cir., 812 F.2d 965, *cert. denied*, 483 U.S. 1009, 107 S.Ct. 3238, 97 L.Ed.2d 743 (1987).

8. Lest our opinion be misconstrued, we do not condone use of incommunicado interrogation by police. This practice inevitably introduces a credibility dispute between the defendant and the interrogator at a suppression hearing and/or at trial. The use of recording devices throughout an interrogation minimizes such danger by injecting objective proof into the inquiry. While DeJesus has not claimed that the detectives acted in an egregious manner during the six minute break, other cases may warrant closer scrutiny into police conduct when a voluntariness inquiry is undertaken by a court.

L.Ed.2d 222; *see also United States v. Medina*, 5th Cir., 887 F.2d 528, 532 (1989).

▆▆ Of course, "[a] confession cannot be fruit of the poisonous tree if the tree itself is not poisonous." *Colorado v. Spring*, 479 U.S. at 571–72, 107 S.Ct. at 856. Therefore, while we agree that the Superior Court failed to make specific findings as to the voluntariness of DeJesus' hospital statements, we are satisfied, after considering the totality of the circumstances, that his three statements to the police while he was in the hospital were voluntary. We view the evidence in the light most favorable to the State. *Marine*, 607 A.2d at 1199. DeJesus has again failed to proffer any evidence of coercive police conduct, which is a "necessary predicate" to a finding that a statement is involuntary for purposes of due process. *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. at 522.

Although the physical and psychological condition of DeJesus at the hospital perhaps rendered him susceptible to police influence, DeJesus has not demonstrated that the detectives exploited his condition by means of coercion or overreaching. *Marine*, 607 A.2d at 1199. To the contrary, the police neither threatened DeJesus nor physically or psychologically coerced him to make a statement during his hospital stay. The detectives obtained the permission of medical personnel to speak with DeJesus before each of his first two statements. At this time, the police viewed DeJesus as a crime victim rather than a suspect. His third statement was at his own initiative. In fact, DeJesus maintained his innocence during this period. His exculpatory statements at the hospital serve to undermine his claim of coercion.

We are satisfied that the record clearly demonstrates that each statement DeJesus made to the police was voluntary. Accordingly, we reject DeJesus' Fourteenth Amendment due process claim regarding the admissibility of his hospital statements.

### III

We next consider DeJesus' contention that his convictions for felony murder and attempted robbery, as well as the accompanying two counts of possession of a deadly weapon during the commission of a felony, must be vacated because the State failed to prove the *corpus delicti* of attempted robbery—the predicate felony for his felony murder conviction. DeJesus claims that the State failed to present any evidence, aside from his confession, which indicates that he either intended or attempted to rob Robinson. To support a felony murder prosecution, the *corpus delicti* rule requires evidence, in addition to a confession, to support the underlying felony. Since there is no such independent evidence in his case, DeJesus claims that his conviction for attempted robbery, as well as the felony murder and the two accompanying weapons convictions, must be reversed.

### A.

▆▆ Before reaching the merits of this claim, we must first address whether DeJesus has properly preserved the issue for appeal. Unless it is the interests of justice, this Court will decline to review those questions which were not raised and fairly presented before the trial court in the first instance. Supr.Ct.R. 8; *Jenkins v. State*, Del.Supr., 305 A.2d 610 (1973). Prior to trial, DeJesus moved to dismiss several counts of the indictment on *corpus delicti* grounds. The Superior Court did not deny the motion but, instead, deferred consideration of the motion until trial. Although DeJesus thereafter moved for an acquittal upon the close of the State's case in chief, and again after the verdict, he based his motions upon insufficient evidence, not *corpus delicti* grounds. The court did not address the issue *sua sponte*, nor did the court rule upon the "reserved" motion. The State contends that this inaction by defense counsel amounted to a tactical decision to abandon the claim, precluding review by this Court. *See Duross v. State*, Del.Supr., 494 A.2d 1265, 1267 (1985).

▆▆ Superior Court Criminal Rule 12(e) provides that the court may defer consideration of pre-trial motions unless that deferment adversely affects the right to appeal by

the party who filed the motion.[9] Thus, the court's action in deferring consideration of the motion preserved that issue through trial. Although the better practice would have been for defense counsel to request a ruling when the trial court apparently lost sight of the motion, the defendant cannot be penalized for this oversight. Under the circumstances, we conclude that the *corpus delicti* issue was properly before the trial court and, in the interests of justice, is subject to consideration on appeal.

## B.

■ Simply stated, the *corpus delicti* rule requires the prosecution to "show some evidence of the existence of a crime, independent of the defendant's confession, to support a conviction." *Shipley,* 570 A.2d at 1168. Every jurisdiction in this country has adopted some variation of the *corpus delicti* rule;[10] it has been an established part of this State's jurisprudence for over one hundred years. *See State v. Blackburn,* Del.Oyer & Term., 75 A. 536, 542 (1892) (*corpus delicti* rule "well settled"). The doctrine was designed to prevent an individual from being convicted of a crime on the basis of his confession when there is no other evidence that a crime, in fact, has been committed. *Shipley,* 570 A.2d at 1168–69. Thus, it reflects a long-standing aversion to convictions obtained solely from the accused's own mouth and a preference for "evidence independently secured through skillful investigation." *Watts v. Indiana,* 338 U.S. 49, 54, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949); *see also Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). Moreover, the *corpus delicti* rule protects those innocent defendants who confess, for whatever reasons, to crimes they have not committed, even though their confessions may be "voluntary" within the meaning of the due process clause. The *corpus delicti* rule seeks

> to prevent errors in convictions based upon untrue confessions alone; its foundation lies in a long history of judicial experience with confessions and in the realization that sound law enforcement requires police investigations which extend beyond the words of the accused. Confessions may be unreliable because they are coerced or induced, and although separate doctrines exclude involuntary confessions from consideration from the jury, further caution is warranted because the accused may be unable to establish the involuntary nature of his statements. Moreover, though a statement may not be "involuntary" within the meaning of this exclusionary rule, still its reliability may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past.

*Smith v. United States,* 348 U.S. 147, 153, 75 S.Ct. 194, 197, 99 L.Ed. 192 (1954) (citations omitted).

■ Generally speaking, the *corpus delicti* rule does not require the State to provide independent evidence of each element of the offense with which the defendant is charged.[11] Rather, the rule only requires

---

9. Superior Court Criminal Rule 12(e) provides in part:
 **Rule 12. Pleadings and Motions Before Trial; Defenses and Objections**
 **(e) Ruling on Motion; Certification for Appeal.**
 A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issues or until after verdict, *but no such determination shall be deferred if a party's right to appeal is adversely affected....* (emphasis added).

10. In 1984, Massachusetts became the final jurisdiction to adopt a variation of the *corpus delicti* rule. *See Commonwealth v. Forde,* 392 Mass. 453, 466 N.E.2d 510 (1984).

11. As one commentator has noted:

 > The traditional approach [to the *corpus delicti* rule] has been to require that the elements of the offense be carefully distinguished and that the corroborating evidence tend to show each of those elements. A growing number of courts, however, are abandoning the strict requirement that the corroborating evidence tend to prove all the elements of the *corpus delicti.* Thus the corroborating evidence need only tend to show the "major" or "essential" harm involved in the offense charged and not all of the elements technically distinguished.
 > 1 *McCormick on Evidence* § 145 at 558 (Strong 4th ed. 1992).

the State to present independent evidence which shows both (1) proof of injury, death or loss, according to the nature of the crime; and (2) proof of criminal means or agency as the cause of the injury, death or loss. *Johnson v. State*, Del.Supr., 338 A.2d 124, 125 (1975); *Derrickson v. State*, Del.Supr., 321 A.2d 497 (1974); *Nelson v. State*, 50 Del. 96, 123 A.2d 859 (1956).

■ In the case of a homicide, whether the charge is murder, manslaughter, or criminally negligent homicide, the *corpus delicti* is established when the State presents independent evidence of the death of a human being which was caused by criminal means. *Shipley*, 570 A.2d at 1169; *Derrickson v. State*, Del.Supr., 321 A.2d 497, 502 (1974). Because the State need not provide independent evidence of each element of the offense with which the defendant is charged, the *mens rea* of the killer may be proven by the confession alone. *State v. Galvano*, 34 Del. 409, 154 A. 461, 464 (1930).

■ Here, the *corpus delicti* of DeJesus' criminally negligent homicide conviction was shown by independent proof when the State introduced evidence that Robinson died and his death was caused by DeJesus' actions (stabbing). Accordingly, DeJesus does not contest his conviction for criminally negligent homicide, or its accompanying weapons offense, on *corpus delicti* grounds. His conviction for felony murder, however, requires a more difficult analysis.

To establish felony murder, the State had to prove that DeJesus, "with criminal negligence, cause[d] the death of another person in the course of and in furtherance of the commission or attempted commission of ... robbery in the first degree...." 11 *Del.C.* § 636(a)(6). Unlike other homicides, felony murder is a compound crime which in fact includes proof of two distinct offenses: an enumerated felony and homicide. Because the underlying felony is an essential element of felony murder, we must confront the issue of whether the *corpus delicti* of felony murder requires independent evidence of the predicate felony, in addition to proof of a death caused by criminal agency. The question is one of first impression for this Court.

There is a split of authority from other jurisdictions which have addressed the issue:

Felony murder cases have posed the problem with special difficulty. Under the traditional application of the *corpus delicti* formulation, the elements of felony murder include the predicate felony as well as the fact of death and the causing of it in a criminal way; thus corroborating evidence would have to prove the predicate felony. Most courts have balked at this and have held that the corroborating evidence need not tend to prove the predicate felony.

1 *McCormick on Evidence* § 145 at 558 (Strong 4th ed. 1992).

The State urges this Court to adopt the position taken by a majority of courts which have confronted this issue: so long as the *corpus delicti* of the homicide (death caused by criminal agency) is established by independent evidence, the predicate felony may be shown by confession alone. *See Hart v. State*, 301 Ark. 200, 783 S.W.2d 40, 42 (1990); *People v. Cantrell*, 8 Cal.3d 672, 105 Cal. Rptr. 792, 504 P.2d 1256 (1973); *State v. Oliveras*, 210 Conn. 751, 557 A.2d 534, 536–37 (1989); *Reyes v. State*, Fla.App., 155 So.2d 663 (1963); *Harrison v. State*, 269 Ind. 677, 382 N.E.2d 920 (1978), *cert. denied*, 441 U.S. 912, 99 S.Ct. 2010, 60 L.Ed.2d 384 (1979); *Ballard v. State*, 333 Md. 567, 636 A.2d 474 (1994); *People v. Hughey*, 186 Mich.App. 585, 464 N.W.2d 914, 916 (1990); *Gentry v. State*, Miss.Supr., 416 So.2d 650, 652–53 (1982); *State v. Johnson*, 31 N.J. 489, 158 A.2d 11, 19–20 (1960); *Commonwealth v. Weeden*, 457 Pa. 436, 322 A.2d 343, 348 (1974); *State v. Bishop*, Utah Supr., 753 P.2d 439, 477–78 (1988).

These courts generally hold that the crime of felony murder should exact the same *corpus delicti* which is required in all homicide cases. In such cases, the prosecutor need only establish independent evidence of a death caused by criminal agency. There is no requirement that the prosecution show independent evidence of the *mens rea* of the defendant, which would distinguish the degree of the homicide committed, because the mental element may be established solely by the defendant's confession. *Hughey*, 186 Mich.App. 585, 464 N.W.2d at 916. Similar-

ly, proof of the remaining elements of felony murder, including the commission of the underlying felony, may be demonstrated by the confession alone. *Id.; Gentry v. State,* 416 So.2d at 652–53.

North Carolina has adopted a variation of this approach. North Carolina also requires independent proof of a death by criminal agency, but does not require that the *corpus delicti* of the underlying felony be proven by independent evidence, *provided that* the "confession, otherwise corroborated as to the murder, includes sufficient facts to support the existence of the felony." *State v. Franklin,* 308 N.C. 682, 304 S.E.2d 579, 586 (1983), *overruled on other grounds, State v. Parker,* 315 N.C. 222, 337 S.E.2d 487 (1985). By this approach, North Carolina has adapted a "trustworthiness" analysis, long recognized in the federal courts, and applied it in the context of felony murder.

■■■■ Under a "trustworthiness" analysis, "the corroborative evidence need not be sufficient, independent of the statements, to establish the *corpus delicti.*" The State, however, is required "to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement." *Opper v. United States,* 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101, 108–09 (1954).[12] In other words, the adequacy of the corroborative evidence is measured not by its tendency to establish the *corpus delicti* but by the extent to which it supports the trustworthiness of the defendant's statement. *United States v. Johnson,* D.C.Cir., 589 F.2d 716, 718–19 (1978). Once a defendant's confession is sufficiently corroborated to render it trustworthy, the prosecution may then use the confession to establish the *corpus delicti* of the crime.

Under a trustworthiness approach to felony murder, the State need not show the *corpus delicti* of the underlying felony by independent evidence provided it produces substantial corroborative evidence to render the defendant's confession trustworthy. *Franklin,* 308 N.C. 682, 304 S.E.2d at 586. Once the State introduces evidence which "goes to fortify the truth of the confession or tends to prove facts embraced in the confession," *Opper v. United States,* 348 U.S. at 92, 75 S.Ct. at 164, the confession is considered trustworthy and the State may then use the confession to establish the *corpus delicti* of the predicate felony.

The final approach to felony murder cases requires the prosecution to demonstrate independent evidence of the *corpus delicti* of both the homicide and the predicate felony. *State v. Bradford,* 254 Kan. 133, 864 P.2d 680, 685 (1993); *see also People v. Emerson,* 203 Mich.App. 345, 512 N.W.2d 3 (1994); *Gribble v. State,* Tex.Crim., 808 S.W.2d 65, 71 (1990), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991) (capital murder requires proof of felony). These courts emphasize that felony murder is a compound crime consisting of both a homicide and a felony—thus, the State should be required to produce evidence independent of the defendant's confession for each crime. *See Emerson,* 203 Mich.App. 345, 512 N.W.2d at 4–5 ("premeditated murder is a single crime, in which the element of deliberation merely serves to enhance the severity of the offense, whereas felony murder is a compound crime consisting of both a murder and a felony"). Consequently, each crime having its own distinct *corpus delicti* must be established by

12. Since the "trustworthiness" approach to corroboration was enunciated by the United States Supreme Court over forty years ago, *see Opper v. United States,* 348 U.S. at 93, 75 S.Ct. at 164, it has gained favor among a significant number of federal and state courts. *United States v. Lopez–Alvarez,* 9th Cir., 970 F.2d 583, 592, *cert. denied,* —— U.S. ——, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992); *United States v. Johnson,* 589 F.2d at 718; *United States v. Wilson,* 3rd Cir., 436 F.2d 122, 124, *cert. denied,* 402 U.S. 912, 91 S.Ct. 1393, 28 L.Ed.2d 654 (1971); *Landsdown v. United States,* 5th Cir., 348 F.2d 405 (1971);

*United States v. Abigando,* 5th Cir., 439 F.2d 827, 833 (1971); *Jacinth v. State,* Alaska Supr., 593 P.2d 263, 266 (1979); *State v. Yoshida,* 44 Haw. 352, 354 P.2d 986, 990 (1960); *People v. Brechon,* 72 Ill.App.3d 178, 28 Ill.Dec. 459, 390 N.E.2d 626 (1979); *State v. Parker,* 315 N.C. 222, 337 S.E.2d 487, 495 (1985) (non-capital cases); *State v. George,* 109 N.H. 531, 257 A.2d 19 (1969); *State v. Ervin,* Tenn.Crim.App., 731 S.W.2d 70, 72 (1986); *Schultz v. State,* 82 Wis.2d 737, 264 N.W.2d 245, 253 (1978). This Court declined to adopt the "trustworthiness" approach in *Johnson v. State,* Del.Supr., 338 A.2d 124, 125–26 (1975).

independent evidence. *Gribble,* 808 S.W.2d at 71.

We believe that the "independent evidence" standard enjoys greater consistency with the objective of the *corpus delicti* rule, as well as the prior holdings of this Court. Our law requires "some evidence of the existence of a crime, independent of the defendant's confession, to support a conviction." *Bright v. State,* Del.Supr., 490 A.2d 564, 569 (1985). The *corpus delicti* rule serves to protect those defendants who may be pressured to confess to crimes that they either did not commit or crimes that did not occur. *Id.* In our view, a person is just as likely to confess to a non-existing felony as he is to confess to a non-existing murder. *Accord Emerson,* 203 Mich.App. 345, 512 N.W.2d at 5; *see also Gribble,* 808 S.W.2d at 71. Therefore, we find no compelling reason why the *corpus delicti* rule should not apply with equal force to compound crimes—where one crime has occurred, but, absent the confession from the defendant, there is no evidence indicating that the underlying crime in fact has taken place.

By legislating the felony murder rule, 11 *Del.C.* § 636(a)(6), the General Assembly has recognized that killings which result from the commission or attempted commission of a felony, even if unintended, are deserving of harsh punishment. In such cases, the factor that elevates a criminally negligent or reckless killing to first degree murder is the added element that the death occur "in the course of and in furtherance of the commission or attempted commission of" a felony. 11 *Del.C.* § 636(a)(6); *Flamer v. State,* Del. Supr., 490 A.2d 104 (1983); *Riley v. State,* Del.Supr., 496 A.2d 997, 1021 (1985). It is well established that the State cannot sustain a felony murder conviction without first proving that a felony occurred. *Cf. Flamer,* 490 A.2d at 118. Proof of the underlying felony is thus a *sine qua non* to a felony murder conviction. Were we to hold that, in a felony murder prosecution, the State must prove only the *corpus delicti* of homicide, but it need not establish independent evidence of the predicate felony, we would, in effect, relax the *corpus delicti* rule in its application to the most serious crimes. In our view, the

purpose of the rule is better served by requiring the prosecution to introduce "some" independent evidence of the *corpus delicti* of *each crime* it charges.

This approach is also consistent with our precedent. In *Stokes v. State,* Del.Supr., 402 A.2d 376, 382 (1979), this Court applied the *corpus delicti* rule in the context of connected crimes, i.e., those crimes arising out of the same act, event, or occurrence. *Stokes* involved a defendant charged with, *inter alia,* intentional murder and robbery. Although the State presented independent evidence in its case in chief which established the *corpus delicti* of the intentional murder, it failed to present any evidence, other than the defendant's confession, indicating that the victim was robbed by the defendant. This Court held that the *corpus delicti* was not independently established, and reversed the robbery conviction.

■ We perceive no convincing reason why our holding in *Stokes* as to connected crimes should not apply equally to compound crimes such as felony murder. In both situations, the defendant is charged with multiple crimes, and each crime alleged should be corroborated by independent evidence. The purpose of the *corpus delicti* rule is not served by permitting the State to rely solely upon the defendant's single, extrajudicial confession to establish the *corpus delicti* of multiple crimes charged against him. Accordingly, we affirm our holding in *Stokes* and find its teaching equally applicable in the felony murder context. Therefore, we hold that, because felony murder necessarily involves both a homicide and a separate felony, to satisfy the *corpus delicti* rule in such cases, the State must provide corroborative evidence that (1) a death occurred; (2) the death was caused by criminal agency; and (3) the underlying predicate felony was committed.

### C.

■ We next consider whether the State established sufficient independent evidence at trial to corroborate its charge that Robinson was killed during the course of an attempted robbery. As noted earlier, the State need only present "some evidence" *ali-*

*unde* the confession to sustain its burden under the *corpus delicti* rule. *State v. Kehm,* 48 Del. 372, 103 A.2d 781 (1954); *Nelson,* 50 Del. 96, 123 A.2d at 862. The independent evidence tending to establish the *corpus delicti* need not be shown beyond a reasonable doubt or by a preponderance of the evidence. *Nelson,* 50 Del. 96, 123 A.2d at 862. There is no quantum requirement for the *independent evidence,* so long as the *evidence as a whole proves* the *corpus delicti* beyond a reasonable doubt. *Jenkins v. State,* Del.Supr., 401 A.2d 83, 86 (1979); *Johnson,* 338 A.2d 124; *Nelson,* 123 A.2d at 862; *Kehm,* 48 Del. 372, 103 A.2d 781.

Under Delaware law, a person may be convicted of robbery if he uses or threatens to use immediate force upon another "in the course of committing theft" with the intent to "compel the owner of the property ... to deliver up the property." 11 *Del.C.* § 831(2); *Morrisey v. State,* Del.Supr., 620 A.2d 207, 213 (1993). A person is guilty of theft when he "takes, exercises control over or obtains property of another person intending to deprive him of it or appropriate it." 11 *Del.C.* § 841. If, during the course of the robbery, the defendant displays a deadly weapon, is armed with and uses or threatens to use a dangerous instrument, or otherwise causes physical injury to any nonparticipant, the degree of the crime is elevated from second to first degree robbery. 11 *Del.C.* § 832.

A person is deemed to have "attempted" to commit a crime if he "intentionally does or omits to do anything which, under the circumstances as he believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of a crime." 11 *Del.C.* § 531(2). Substantial step is defined as "an act or omission which leaves no reasonable doubt as to the defendant's intention to commit the crime for which he is charged with attempting." 11 *Del.C.* § 532. In order to carry its burden of proving the elements of attempted robbery in this case, therefore, the State had to establish that DeJesus took a substantial step to take some property from Robinson by the use or threat of force, and that he had the specific intent to commit the offense of robbery at that time.

This Court has not addressed the issue of *corpus delicti* as it relates to an attempted crime. Our previous encounters with the *corpus delicti* rule involved consummated offenses. *See State v. Blackburn,* 23 Del. 479, 75 A. 536 (homicide); *State v. Miller,* 14 Del. 564, 32 A. 137 (1892) (same); *State v. Galvano,* 34 Del. 409, 154 A. 461 (same); *Nelson v. State,* 50 Del. 96, 123 A.2d 859 (same); *Derrickson,* 321 A.2d 497 (same); *Shipley v. State,* 570 A.2d 1159 (same); *State v. Hand,* 15 Del. 545, 41 A. 192 (1894) (arson); *Johnson v. State,* 338 A.2d 124 (rape); *Jenkins v. State,* 401 A.2d 83 (possession of a deadly weapon during the commission of a felony); *Stokes v. State,* 402 A.2d 376 (1979) (robbery); *Bright v. State,* 490 A.2d 564 (rape and kidnapping; *Clendaniel v. Voshell,* Del. Supr., 562 A.2d 1167 (1989) (driving while intoxicated).

We recognize that, in the context of inchoate crimes, such as attempts, the traditional application of the rule is difficult because, by definition, these crimes do not include a tangible injury or loss which can be isolated as the focus of the *corpus delicti.* *See* 1 *McCormick on Evidence,* § 145 at 560; *State v. Parker,* 315 N.C. 222, 337 S.E.2d at 493; *see also Smith v. United States,* 348 U.S. at 154, 75 S.Ct. at 198. In a robbery case, the *corpus delicti* is clearly discernible as the physical property taken by force from another. In a case of attempted robbery, however, the injury or loss is far less tangible and, indeed, no loss or taking at all may occur where the robber's efforts are frustrated. In such cases, the defendant is moving toward the commission of a crime which is not, and may never be, consummated. Thus, an inquiry into whether a defendant engaged in conduct which is a "substantial step" toward a robbery may be more demanding than whether there has been a physical "taking" of property. Nevertheless, we believe that the crime of attempted robbery carries a distinct *corpus delicti.* In order to establish the *corpus delicti* for any crime, the prosecution must introduce independent evidence of the criminal conduct forming the gravamen of the offense. *See* 1 *McCormick on Evidence,* § 145 at 558 ("major" or "essential" elements of offense). The gravamen of a robbery or attempted robbery charge is a

"taking" by "force." *See State v. Norris*, 45 Del. 333, 73 A.2d 790 (1950) (the common law offense of robbery required two elements: taking of property (larceny) by violence or by putting the person in fear).

■ We therefore hold that, in an attempted robbery case, the State must establish some evidence, *aliunde* the defendant's confession, which tends to show that the defendant (1) attempted to take, exercise control over or obtain the property of another (2) by the use or threat of immediate force. As in a homicide, the State may rely solely upon the defendant's confession to establish the specific intent (*mens rea*) to commit the offense of robbery.

■ Here, the "stabbing" of Robinson by DeJesus plausibly demonstrates the use of force. Nevertheless, the stabbing is, by itself, insufficient independent evidence to sustain the *corpus delicti* of an attempted robbery. It must be shown that DeJesus used or threatened force **as a means to take the property of Robinson.** Although the taking and the application of force need not be contemporaneous, there must be "a causal connection between the use or threat of force and the [attempted] theft." *Delaware Criminal Code with Commentary* § 831 at 258 (1973); *Winborne v. State*, Del.Supr., 455 A.2d 357, 359 (1982). If it is shown that DeJesus brandished the knife or otherwise threatened Robinson in order to take or appropriate his property, the State has sustained its burden of proving the *corpus delicti* of the crime. Without such independent evidence that DeJesus attempted to "take" or "appropriate" the property of Robinson, however, his convictions cannot stand.

The State insists that it has met this threshold. According to its theory of the case, originating from the confession, DeJesus arranged to buy some marijuana from Robinson as a pretext to rob him. DeJesus planned to steal the marijuana so that he could sell it in order to pay the $224 he owed in fines and court costs. DeJesus also planned to kill Robinson to eliminate the $183 debt he owed him. On the day of the incident, DeJesus armed himself with a knife that he obtained from his place of employ-ment and Robinson picked him up on his lunch hour.

After cashing his paycheck, DeJesus gave Robinson one hundred dollars in partial payment for his debt. DeJesus told Robinson that he had another check, and the two men drove to the bank. Although DeJesus had no such check, he entered the bank under the guise of cashing the check to pay the remaining amount he owed to Robinson. When DeJesus returned to the car without any money, the two men argued. Robinson then began to back the car and DeJesus suddenly stabbed him in the neck. During the next three to five minutes, the men struggled, and Robinson was able to gain control of the knife and stab DeJesus in the abdomen. As Robinson became weaker due to blood loss from his neck wound, DeJesus again gained control of the knife and stabbed Robinson a second time in the torso. DeJesus then attempted to gain access to the driver's side so that he could flee. Because he was too weak to do so, he got out of the car and collapsed on the sidewalk.

In support of its theory, the State points to the following independent evidence which it introduced at trial: (1) the recorded message taken from Robinson's answering machine in which DeJesus told Robinson that he wanted to buy some marijuana; (2) the one hundred dollars found in Robinson's pants pocket; (3) the white powdery substance found in the car which resembled drugs; (4) the steak knife found in the car; (5) DeJesus' fines and court costs; and (6) eyewitness testimony that DeJesus climbed into the driver's seat immediately after the struggle with Robinson. The State contends that this evidence certainly satisfies its relatively low threshold of proof requiring "some evidence" of an attempted robbery. We disagree.

As we view the evidence, the State failed to establish, *aliunde* DeJesus' confession, the *corpus delicti* of attempted robbery. At a minimum, the evidence the State presented at trial was equivocal and, in several key respects, directly contradicted DeJesus' confession. The answering machine tape, the drug-like substance found in the car, and the one hundred dollars found in Robinson's pocket are indicative of a drug transaction—

not an attempted robbery. In fact, it is more plausible that DeJesus gave Robinson one hundred dollars in payment for drugs and the men struggled after DeJesus discovered that the substance in the car was not drugs. We find the evidence significantly more consistent with a drug transaction gone awry than an attempted robbery. Indeed, the State's theory that DeJesus initially gave Robinson the one hundred dollars with the intention to "steal" it later is illogical. In short, neither this evidence, nor any reasonable inference from this evidence, demonstrates that DeJesus ever attempted to "take" or "appropriate" any property ("drugs" or the one hundred dollars) from Robinson.

Further, the knife that was found in the car does not establish an attempted robbery. DeJesus' confession that he took the knife from his employer was contradicted by the evidence at trial. DeJesus' supervisor testified that kitchen knives were not normally kept in the company cafeteria. He also testified that he could not identify the steak knife found in Robinson's car as a knife he had ever seen in the work place. In fact, there was testimony at trial that Robinson commonly kept a knife in his car. Therefore, while the knife was evidence as the instrument which caused Robinson's death, it was not independently shown that it was wielded by DeJesus as a means to threaten Robinson so that DeJesus could take his property.

■ Moreover, while DeJesus' fines and court costs could ostensibly provide him with a *motive* for robbery, this evidence is also not indicative of the *corpus delicti* of attempted robbery. DeJesus' fines and costs demonstrated that DeJesus owed money, not that he attempted a robbery. Assuming that a person who is indebted has a motive to steal, motive is insufficient to supply the *corpus delicti* unless it is demonstrated that one's motive materialized into intent and action.

■ The State also claims that DeJesus' purported attempt to gain access to the driver's side after the struggle indicates his desire to drive away or flee, which is an admission of guilt. *Thomas v. State*, Del.Supr., 467 A.2d 954 (1983); *Tice v. State*, Del.Supr., 382 A.2d 231 (1977); 1 *McCormick on Evi-*

*dence*, § 263. While we agree that flight may, under appropriate circumstances, be relevant as tending to show an admission of guilt, we do not believe that conclusion is warranted here. In this case, it is just as likely that DeJesus, suffering from a serious wound, was attempting to go to the hospital to seek medical attention or simply flee from the scene of a violent confrontation. This equivocal evidence does not tend to show that DeJesus ever attempted to take the property of Robinson by force or threat of force.

The State finally contends that an attempted robbery is evidenced by a general knowledge that robbery or attempted robbery is commonly a motive for murder and that drug dealers make convenient robbery targets. *Ferguson v. State*, Del.Supr., 642 A.2d 772 (1994); *Sullivan v. State*, Del.Supr., 636 A.2d 931 (1994); *Wright v. State*, Del.Supr., 633 A.2d 329 (1993); *Riley v. State*, Del.Supr., 496 A.2d 997 (1985). According to the State, the death of Robinson itself is evidence of a felony (because a felony is commonly a motive for murder), and this evidence of a felony likewise causes the killing to constitute felony murder. The circularity of this rationale is quite apparent. Even if the State's correlation were true, this Court has never embraced the position that such generalizations are an adequate substitute for proof. Moreover, the State failed to present such evidence at trial and we cannot entertain this claim for the first time on appeal. Supr. Ct.R. 8.

We find that DeJesus' admission that he attempted to rob Robinson is insufficiently corroborated under the *corpus delicti* rule. There were no witnesses who heard or saw the events immediately preceding the struggle, nor did anyone see which man had produced the knife. No passersby saw DeJesus wielding the knife or threaten Robinson prior to the struggle. Although circumstantial evidence is certainly sufficient to corroborate a defendant's confession, such evidence is lacking here. Despite the fact that the evidential threshold imposed upon the State only requires "some proof," the independent evidence must "touch" or "concern" the *corpus delicti* of the criminal act or injury the law seeks to prohibit. *See Lemons v. State*, 49

Md.App. 467, 433 A.2d 1179, 1182 (1981). Here, the State had the burden of establishing an attempt by DeJesus to take or appropriate Robinson's property by force or threat of force. We find no evidence cited by the State, aside from DeJesus' confession, which permits a reasonable inference that this activity occurred. *See also Monroe v. State,* Del.Supr., 652 A.2d 560, 561 (1995). In fact, most of the evidence at trial rebutted DeJesus' confession. Apart from the conflicting evidence noted earlier, the medical examiner testified that the severity of Robinson's neck wound created only a one percent chance that DeJesus initiated the struggle and stabbed Robinson first. This testimony conflicted directly with DeJesus' confession and the State's theory of the case. It is significant that the jury rejected the charge of intentional murder, opting to find DeJesus guilty of the lesser included offense of criminally negligent homicide. That finding, together with the confession-supported verdict of felony murder, suggests the jury's belief that Robinson's death occurred in a spontaneous, violent confrontation.

Without his confession, there was simply no tangible evidence indicating that DeJesus either planned a robbery or attempted to commit one. On four occasions prior to his confession, DeJesus steadfastly denied committing either the murder or the robbery. He confessed only after the police revealed that they had incriminating evidence in regard to his participation in the murder. In short, the only evidence that the crime of attempted robbery actually occurred was DeJesus' confession that it did.

> [A] confession cannot be used to corroborate the *corpus delicti.* The *corpus delicti* can corroborate the confession but the confession cannot be used to bolster up and support the body of the crime itself; the body of the crime must stand alone and be established firmly....

*State v. Galvano,* 34 Del. 409, 154 A. at 463.

In this case, it is very likely that DeJesus confessed to criminal conduct which did not exist. The police are under an obligation to investigate and secure independent evidence so that confessions are corroborated to ensure their trustworthiness. *Smith v. United States,* 348 U.S. at 153, 75 S.Ct. at 197. The *corpus delicti* rule is a guaranty that confessions, an appropriate evidential device, are supported by independent evidence. The rule strikes the appropriate balance between protecting innocent defendants from their false confessions and the State's interest in prosecuting those who deserve punishment.

Although his statements were otherwise admissible under *Miranda* and the due process clause, the circumstances surrounding DeJesus' confession render his admissions highly suspect. A psychologist and a retardation expert testified that DeJesus was retarded, highly suggestible, and that he would say anything to appease authority figures if pressured. Moreover, DeJesus spoke Spanish as his natural language and he was not provided an interpreter during the interrogations. Further, DeJesus was evidently in pain while the police questioned him, despite the influence of pain-killing medication. Finally, DeJesus confessed only after the police confronted him with their suspicions. DeJesus then confirmed their suspicions in his confession, and the evidence at trial contradicted his confession in certain key respects. Thus, the confession was not particularly trustworthy, underscoring the need for independent, corroborative evidence. *Compare Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979) (fundamental due process guaranteed by Fourteenth Amendment requires proof beyond a reasonable doubt of each element of the offense with which defendant is charged). Such evidence was clearly lacking here. Accordingly, we reverse the convictions of DeJesus for felony murder and attempted robbery, as well as their accompanying two charges of possession of a deadly weapon during the commission of a felony.

### IV

DeJesus next claims that the trial court abused its discretion in limiting the scope of testimony of his expert witness. On the final day of testimony at DeJesus' trial, the defense called David White ("White") as an expert witness in mental retardation. White was employed as a counselor to persons with mental disabilities in the Pennsylvania court

system. On the first day of trial, the defense had notified the prosecution that White would testify as an expert witness. *See* Super.Ct.Crim.R. 16. As required by Rule 16, the notice recited that White had administered tests to DeJesus and that he would express his opinion that DeJesus suffered from mental retardation.

On direct examination, White testified that mentally retarded individuals "confess often to crimes they haven't committed." The State immediately objected. At sidebar, the prosecutor argued that this testimony went well beyond the discovery notice, thereby causing the State unfair prejudice because it could not prepare for cross-examination or provide its own expert for rebuttal. Agreeing with the State, the trial judge directed defense counsel to stay within the bounds of the discovery notice and instructed the jury to disregard White's last answer.

On appeal, DeJesus concedes the discovery violation but contends that the court abused its discretion in limiting the expert's testimony as a sanction for that violation. DeJesus contends that the trial judge should have imposed a less drastic sanction, such as granting a continuance, in order to allow the State sufficient time to prepare for cross-examination and to obtain a counter-expert. We find this claim without merit.

■■■ The trial judge enjoys broad discretion in determining the appropriate sanction for a discovery violation. *Doran v. State*, Del.Supr., 606 A.2d 743, 745 (1992). In determining the sanction, the court must weigh all relevant factors which may include: the reasons for the violation, the extent of any prejudice to the opponent, and the feasibility of curing the violation rather than excluding the evidence. *Id.* at 745 n. 3. Before rendering its decision, the court should balance the needs of society with the defendant's right to a fair trial. *Wheat v. State*, Del.Supr., 527 A.2d 269, 275 (1987).

■■■ Rule 16(d)(2) expressly provides that a sanction for a discovery violation may include the court prohibiting the introduction of the evidence not disclosed. This sanction was entirely appropriate here. The only explanation proffered by the defense as to why

the identity of White was not disclosed until the first day of trial, nearly one year after DeJesus' arrest, was that White had only recently become involved in the case. Moreover, the true substance of his testimony was not divulged until the final day of trial—well after the State had rested its case. *See State v. Bowling*, R.I.Supr., 585 A.2d 1181, 1184 (1991). Under the circumstances, we are satisfied that the court's decision to exclude part of White's testimony did not constitute an abuse of discretion.

## V

■■■ DeJesus' next claim is that he was denied a fair trial when the Superior Court denied his motion for a mistrial. At trial, the State called the medical examiner to testify regarding the cause of the victim's death. At the conclusion of his testimony, the trial judge asked the medical examiner several questions. In answering the court's questions, the witness identified one of the attorneys for DeJesus as a public defender. Defense counsel moved for a mistrial. The trial judge took the motion under advisement and offered to deliver an immediate cautionary instruction to the jury. Defense counsel declined the court's offer to give a cautionary instruction.

Defense counsel did, however, renew its motion for a mistrial after the jury rendered its verdict. The court denied the motion. In its opinion, the court reasoned that this isolated and unsolicited reference to counsel as a public defender did not provoke a response in the jury which pervaded the entire trial and thus was not sufficiently prejudicial to warrant a new trial. We agree.

■■■ A motion for a mistrial based upon an impropriety occurring at trial is directed to the sound discretion of the trial court. *McCloskey v. State*, Del.Supr., 457 A.2d 332, 337 (1983); *Lovett v. State*, Del.Supr., 516 A.2d 455, 475 (1986), *cert. denied*, 481 U.S. 1018, 107 S.Ct. 1898, 95 L.Ed.2d 504 (1987). It is the trial judge, not the appellate court, who is necessarily in the best position to gauge the effect and possible prejudicial impact of the improper comment. *Thompson v. State*, Del.Supr., 399 A.2d 194, 199 (1979).

In this case, the court's ruling was plainly correct. While reference to the impecunious condition of the defendant in a trial involving a robbery charge may be highly prejudicial, the isolated and unsolicited remark by the witness did not warrant a mistrial here. *Compare Bailey v. State*, Del.Supr., 521 A.2d 1069, 1076 (1987) (reference to defendant's prior conviction during course of subsequent proceedings is cause for mistrial *ipso facto* ). The prosecution did not elicit the remark. Additionally, the trial court promptly interrupted the witness *sua sponte* in mid-sentence. It is uncertain whether the jury was even alerted to the identification of defense counsel as a public defender. Finally, defense declined the court's offer to give a curative instruction to the jury. Under the circumstances, we believe the trial court properly exercised its discretion in ruling that any possible prejudice flowing from the improper remark did not warrant a new trial.

## VI

DeJesus next claims that the court abused its discretion by not allowing him to present surrebuttal evidence. The trial court declined to permit the defendant to recall a witness who testified earlier for the defense. The trial judge ruled the proffered evidence largely cumulative. We find no basis to disturb the trial court's discretionary ruling in that respect. *Herhal v. State*, Del.Supr., 283 A.2d 482, 484 (1971).

## VII

Finally, DeJesus contends that a portion of his confession referring to other crimes should not have been admitted at trial because it ran afoul of the dictates of Delaware Rule of Evidence 404(b) and *Getz v. State*, Del.Supr., 538 A.2d 726 (1988). Prior to opening statements, defense counsel requested that the court redact DeJesus' confession to eliminate his statements that his motive for the attempted robbery and murder of Robinson was to obtain money for the $224.00 in fines and court costs which he owed, as well as the further expenses he anticipated for the pending charge for hindering prosecution. DeJesus sought to exclude part of his confession and any testimo-

ny regarding those crimes. The State countered that the evidence was necessary to demonstrate the motive of DeJesus in committing the charged crimes, and also indicated that DeJesus was alert at the time of his confession, thus rebutting his contention that he was so disoriented during his interrogation that his confession was not the product of a rational intellect.

The trial court determined that the evidence was admissible under Rule 404(b) to prove motive and that, after the jury received a limiting instruction, the probative value of the evidence was not substantially outweighed by its prejudice. The trial court then delivered defense counsel's suggested cautionary instruction to the jury, which emphasized the minor nature of the hindering prosecution charge and that it was a mere accusation for which DeJesus' guilt had yet to be determined.

A careful analysis of the *Getz* factors leads us to conclude that the Superior Court was correct in allowing the evidence at trial. First, the evidence went to at least one central issue in the case: DeJesus' mental state during his confession to the police. Moreover, motive is one of the "purposes" listed in Rule 404(b). Also, the crimes were far from remote and the jury was instructed using the language suggested by defense counsel. These factors notwithstanding, DeJesus contends that the unresolved hindering prosecution charge was a mere accusation which was not shown by evidence which was "plain, clear and conclusive." *Getz*, 538 A.2d at 734 (quoting *Renzi v. State*, Del.Supr., 320 A.2d 711, 712 (1974)). In this case, however, the emphasis was not on the crimes or acts themselves but, rather, on the consequences they had on DeJesus financially and his mental state during his confession. We therefore find no abuse of discretion in the court's ruling in this respect.

## VIII

In sum, we find no error in the Superior Court's ruling regarding the admissibility of DeJesus' pretrial statements. We conclude, however, that the State is required to present some independent, corroborating evi-

dence of the *corpus delicti* of both the murder and its predicate felony and, in this case, the State has failed to establish the *corpus delicti* of attempted robbery. The convictions for felony murder, attempted robbery, and the related weapons offense are REVERSED. DeJesus' remaining claims of error implicate the discretion of the trial judge and we find no abuse of discretion. Therefore, DeJesus' convictions for criminally negligent homicide and its accompanying weapons charge are AFFIRMED.

At sentencing, the court merged DeJesus' convictions for criminally negligent homicide and its companion weapons offenses into his convictions for felony murder and its weapon offense. Upon remand, the trial court must resentence DeJesus for his convictions for criminally negligent homicide and one count of possession of a deadly weapon during the commission of a felony. Jurisdiction is not retained.