# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
## IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.1310011475 |
| | ) | |
| KIMBERLY S. MAUK, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: June 27, 2014
Date Decided: September 29, 2014

*Upon Defendant's Motion to Bar Statements*
*Procured in Violation of Miranda*: **DENIED**
*Upon Defendant's Motion to Suppress*: **DENIED**

Edmund Daniel Lyons, Esquire, 1526 Gilpin Ave, Wilmington DE 19806, for Defendant.

Barzilai K. Axelrod, Esquire, Deputy Attorney General, Department of Justice, Carvel State Office Building, 820 N. French Street, Wilmington, DE 19801, for the State of Delaware

**JURDEN, J.**

# I. INTRODUCTION

Defendant Kimberly Mauk is charged with Driving a Vehicle while Under the Influence of Alcohol ("DUI"), two counts of Vehicular Assault First Degree, two counts of Vehicular Assault Second Degree, and Driving a Vehicle While License is Suspended or Revoked, relating to a two-vehicle collision that occurred on October 18, 2013. Mauk has filed a motion to suppress certain statements she made to the chief investigating officer and a motion to suppress the results of a blood test taken at the hospital. For the reasons stated below, Mauk's motions to suppress are **DENIED.**

# II. FACTS

On October 18, 2013, at approximately 6:49 p.m., Delaware State Trooper Cpl. Scott Mauchin ("Cpl. Mauchin") was dispatched to a two-vehicle collision at the intersection of Concord Pike and Fairfax Boulevard in New Castle County Delaware.[1] When Cpl. Mauchin arrived at the scene around 7:18 p.m., emergency medical technicians, fire department personnel, and two other Delaware State Troopers were already at the scene.[2] Mauk was the only occupant in her vehicle and the second vehicle contained a family of four, including two adults and two

---

[1] Transcript of March 14, 2014 Suppression Hearing at 9–10 (No. 43) ("Tran.").
[2] *Id.* at 11–12, 13–14.

children.[3]  All of the occupants of both vehicles were transported to Christiana Hospital by ambulance before Cpl. Mauchin had the chance to speak with any of them.[4]  According to three independent witnesses at the scene, the accident occurred when Mauk made a left turn across oncoming traffic.[5] A second trooper at the scene advised Cpl. Mauchin that he had approached Mauk's vehicle and could smell alcoholic beverages coming from the front compartment area of the vehicle.[6]

Cpl. Mauchin left the accident scene and went to the hospital, where he arrived between 8:05 p.m. and 8:10 p.m..[7]  Upon arrival, after securing permission from Mauk's treating nurse,[8] Cpl. Mauchin made contact with Mauk to make his own assessment of her and to determine what happened at the collision scene.[9] When Cpl. Mauchin entered Mauk's hospital room, she was on a gurney with two IV lines in her arms.[10]  The only other person in the room was Nurse Mary Kathleen Fillingame ("Nurse Fillingame").[11]  Mauk had been administered 0.5 milligrams of Dilaudid, a narcotic pain medication.[12] Nurse Fillingame, who

---

[3] *Id.* at 18.
[4] *Id.* at 14.
[5] *Id.* at 16.
[6] *Id.* at 15.
[7] *Id.* at 16–17.
[8] *Id.* at 65.
[9] *Id.* at 19–20.
[10] *Id.* at 20.
[11] *Id.*
[12] *Id.* at 113.

administered the Dilaudid, testified that 0.5 milligrams is a "very small [dose] for an adult."[13]

When Cpl. Mauchin began to discuss the accident with Mauk, he noticed that Mauk was groggy and her speech was slurred and slow, but her eyes were not dilated or glassy.[14] While talking to Mauk, Cpl. Mauchin also detected a moderate odor of alcoholic beverage on her breath from about two feet away.[15]

When Cpl. Mauchin asked Mauk what happened, she stated that she was turning left on a green light and was hit.[16] Cpl Mauchin asked Mauk if she had consumed any alcohol prior to the collision and Mauk initially said "no."[17] Upon being informed that he could smell an odor of alcohol on her breath, Mauk said "not recently," and then said that she had two beers at Seasons Pizza.[18] Cpl. Mauchin was familiar with the area, and knew that Seasons Pizza was a few miles north of where the collision occurred.[19]

At this point, Cpl. Mauchin informed Mauk that he suspected that she was driving under the influence and wanted to acquire a blood sample from her.[20] Cpl. Mauchin explained to Mauk that the hospital had an Authorization For Specimen

---

[13] *Id.* at 145.
[14] *Id.* at 21–22.
[15] *Id.* at 22–23.
[16] *Id.* at 21.
[17] *Id.* at 23.
[18] *Id.* at 23–24.
[19] *Id.* at 24.
[20] *Id.* at 25.

Acquisition form[21] ("Consent Form") that she "needed to sign . . . in order for one of the hospital staff to withdraw blood, but that she could refuse it."[22] Cpl. Mauchin told Mauk that the "alternative to refusing" was that he would obtain a search warrant.[23]

While Cpl. Mauchin was discussing the Consent Form with Mauk, Chris Belair, Mauk's significant other and father of her children, arrived along with their two children.[24] According to Cpl. Mauchin, he and Belair discussed the situation outside of Mauk's hospital room.[25] During their conversation, Cpl. Mauchin stated that he "had every intention of leaving there with a blood sample."[26] Contrary to Belair's testimony, Cpl. Mauchin denied telling Belair that if Mauk did not consent, "the penalties would be higher."[27]

Following his conversation with Cpl. Mauchin, Belair and Mauk's children went into Mauk's hospital room and Cpl. Mauchin remained outside.[28] After a few minutes, Belair stepped out of Mauk's hospital room and told Cpl. Mauchin that "she'll give you consent."[29] Cpl. Mauchin then entered the room, and Mauk

---

[21] Joint Exhibit at 12–13.
[22] *Id.*
[23] *Id.*
[24] *Id.* at 26–27.
[25] *Id.*
[26] *Id.* at 28.
[27] *Id.* at 79.
[28] *Id.* at 28–30.
[29] *Id.* at 30.

signed the Consent Form at 8:51 p.m.[30] By signing the form, Mauk gave "permission to Christiana Care Health Services to take [blood] . . . for police purposes."[31] The Consent Form provided that the test was "blood alcohol determination" and the purpose was "driving under the influence."[32] In addition to Mauk, two hospital nurses signed the form as well.[33] At no point in this process was Mauk handcuffed.[34]

After she signed the Consent Form but before her blood was drawn, Mauk asked whether the driver of the second vehicle would be giving a blood sample.[35] Cpl. Mauchin responded in the negative and explained that the second driver was not suspected of driving under the influence.[36] Upon hearing this, Mauk became upset and agitated.[37] Cpl. Mauchin advised Mauk that he was aware of Mauk's prior DUI's and she yelled back, "they had nothing to do with this!"[38] At no time during or after this conversation did Mauk withdraw her consent.[39]

---

[30] *Id.* at 32–33. *See* Joint Exhibit at 12–13.
[31] *Id.* at 31–32, 82–83. *See* Joint Exhibit at 12–13.
[32] *Id.* at 32.
[33] *Id.*
[34] *Id.* at 33.
[35] *Id.* at 35–36.
[36] *Id.*
[37] *Id.* at 97.
[38] *Id.*
[39] *Id.* at 56.

When Nurse Fillingame was unable to draw Mauk's blood, she called a phlebotomist who successfully drew Mauk's blood at 9:10 p.m..[40] Cpl. Mauchin noted that Mauk's demeanor and composure during the blood draw was the same as it had been prior to the blood draw— Mauk was "lying on the gurney and seemed relaxed."[41] Nurse Fillingame testified that had Mauk not provided consent, she would not have drawn blood.[42] According to Cpl. Mauchin, his interaction with Mauk at the hospital lasted approximately 35 minutes from first contact to a few minutes after the blood draw.[43]

After the blood draw, Cpl. Mauchin spent approximately two hours checking up on the occupants of the other vehicle. Cpl Mauchin said that the purpose of this part of his investigation was to assess the extent of their injuries and to determine their vantage point as to the events that had transpired.[44] Cpl. Mauchin noted that the driver of the second vehicle was conscious, alert, and showed no signs of being under the influence of any type of alcohol or drug.[45]

Mauk was arrested on October 20, 2013, upon her release from the hospital.[46]

---

[40] *Id.* at 53.
[41] *Id.* at 36.
[42] *Id.* at 138–39.
[43] *Id.* at 37.
[44] *Id.* at 40–42.
[45] *Id.*
[46] *Id.* at 38.

## III. STANDARD OF REVIEW

On a motion to suppress evidence seized during a warrantless search or seizure, the State bears the burden of "establishing that the challenged search or seizure comported with the rights guaranteed to . . . [the defendant] by the United States Constitution, the Delaware Constitution, and Delaware Statutory law."[47] "The burden of proof on a motion to suppress is proof by a preponderance of the evidence."[48]

## IV. PARTIES' CONTENTIONS

Mauk filed two motions in connection with her October 20, 2013 arrest. First, Mauk filed a motion to exclude the statements she made to Cpl. Mauchin at the hospital. Mauk argues that these statements were obtained in violation of *Miranda*[49] because she was subject to custodial interrogation but was never advised of her *Miranda* rights. The State argues that Mauk was not in custody at the hospital because routine accident investigation at the scene or at the hospital does not constitute custodial interrogation.

Second, Mauk moved to suppress the results of Mauk's blood testing conducted at the hospital, arguing that the blood draw was an impermissible search in violation of the Fourth Amendment of the U.S. Constitution, and Article 1,

---

[47] *State v. Iverson*, 2011 WL 1205242, at *3 (Del. Super. 2011) (citing *Hunter v. State*, 783 A.2d 558, 560–61 (Del. 2001)).
[48] *Id.*
[49] *Miranda v. Arizona*, 384 U.S. 436 (1966).

7

Sections 6 and 7 of the Delaware Constitution because there was no warrant or probable cause. Mauk argues that her consent was not voluntarily given because she was under the influence of both alcohol and pain medication at the time she signed the Consent Form and during the blood draw itself. Mauk also argues that Cpl. Mauchin coerced her into consenting to the blood draw by threatening to get a warrant if she did not consent.

## V. DISCUSSION

### 1. Admissibility Of Mauk's Statements

*Miranda* warnings are only required when a suspect is both in custody and subject to interrogation by a State agent.[50]  A law enforcement officer becomes obligated to administer *Miranda* warnings "only where there has been such a restriction on a person's freedom as to render him in custody."[51] The legal standard used to determine custody is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[52] "When determining whether an interrogation has occurred in a custodial setting . . . the court must review the totality of the circumstances surrounding the interrogation by applying an objective, reasonable person standard."[53]

---

[50] *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).
[51] *Stansbury v. California,* 511 U.S. 318, 322 (1994).
[52] *California v. Beheler*, 463 U.S. 1121, 1125 (1983).
[53] *DeJesus v. State*, 655 A.2d 1180, 1190 (Del. 1995) (citing *Marine v. State*, 607 A.2d 1185, 1193 (Del. 1992)). *See also Stansbury*, 511 U.S. at 323 ("Our decisions make clear that the initial

8

Here, the Court must examine the totality of the circumstances to determine whether Mauk was subject to custodial interrogation at the hospital. This Court has held that, "[i]nvestigation at the scene immediately following an accident is considered routine, initial investigation, even where questioning occurs at the hospital."[54] However, there is no *per se* "hospital rule" in a custody inquiry because each case must be determined on a case-by-case basis.[55]

In *DeJesus v. State*, investigating officers went to the emergency room to speak to the defendant who was being treated for a stab wound.[56] The defendant was "lying on a hospital gurney and appeared to be in great pain," when an investigating officer asked the defendant what had happened.[57] After eliciting an incriminating statement, the defendant was then provided an incomplete recitation of his *Miranda* rights. The defendant contended that he was in custody during the interview at the hospital because he was not free to leave the hospital at any time.[58] The Delaware Supreme Court concluded that:

---

determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

[54] *Fuentes v. State*, 2002 WL 32071656, *2 (Del. Super. 2002); *Hammond v. State*, 569 A.2d 81 (Del. 1989); *Laury v. State,* 260 A.2d 907, 908 (Del. 1969). In *Hammond*, on an appeal following a conviction of vehicular homicide, the Delaware Supreme Court held that statements made by a hospitalized defendant to police who were primarily concerned with identifying the victims were not custodial in nature. *Hammond*, 569 A.2d at 94.

[55] *DeJesus*, 655 A.2d at 1191.

[56] *Id.* at 1186–87.

[57] *Id.* at 1187.

[58] *Id.* at 1190.

[w]hile [the defendant's] freedom of movement was undoubtedly restricted throughout his hospitalization, his confinement was caused by his own physical incapacity—*not* police compulsion. At no time did the police attempt to physically restrain [the defendant]: he was not handcuffed, nor did the police guard his hospital room to prevent his escape. Further, the detectives did not impede [the defendant's] release from the hospital. Rather, [the defendant] left on his own accord.[59]

In *State v. Pustolski*, a vehicular fatality case, the defendant was transported to the hospital by ambulance.[60] At the hospital and after the defendant was prescribed pain medication, the investigating officer spoke to the defendant without a recitation of the defendant's *Miranda* rights.[61] The treating nurse also obtained a sample of the defendant's blood after the defendant signed a hospital consent form that noted that the defendant was under arrest.[62] The Court held that the defendant was not subject to custodial interrogation because the defendant was not restrained in handcuffs, the defendant was unable to leave as a result of her medical condition and not police custody, and the officers' conversation was part of the reconstruction unit's investigation.[63] Additionally, the Court concluded that the language on the hospital consent form stating that the defendant was under

---

[59] *Id.* at 1191.
[60] *State v. Pustolski*, No. 0903005777, slip op. at 2 (Del. Super. Ct. Nov. 30, 2009).
[61] *Id.* at 7.
[62] *Id.* at 9–10.
[63] *Id.* at 16–18.

arrest was not determinative of custody status, but merely "a fact that the totality of circumstances suggests the contrary."[64]

Here, similar to *DeJesus* and *Pustolski*, the totality of the circumstances indicates that Mauk was not formally arrested and any confinement was caused by her own physical incapacity, not police compulsion. Cpl. Mauchin was unable to obtain statements at the collision scene because all of the persons involved were being treated by medical personnel and were transported to the hospital by ambulance. Upon arriving at the hospital, after first securing permission from Mauk's treating nurse, Cpl. Mauchin made contact with Mauk to make his own assessment of Mauk and to determine what happened at the collision scene. Cpl. Mauchin was the only trooper present in the hospital room and Mauk's significant other and children freely moved throughout the area. There were times when Cpl. Mauchin left the Mauk's vicinity and did not stand on guard at Mauk's door. Mauk's freedom was only restricted by her medical condition, and not by handcuffs or any other police restraint.

Mauk argues that Cpl. Mauchin's testimony that if Mauk had attempted to leave the hospital he probably would not have let her leave before he obtained her blood sample, demonstrates that Mauk was subject to custodial interrogation.[65] A determination of custody depends on objective circumstances of the interrogation,

---

[64] *Id.* at 16.
[65] Tran. at 54.

not the subjective views harbored by the police officer.[66] There is no evidence that Mauk could reasonably believe her freedom or action or movement was restricted during Mauk's limited questioning with Cpl. Mauchin.

## 2. Admissibility Of The Results Of Mauk's Blood Test

Mauk claims that the blood draw violated the Fourth Amendment because there was no probable cause or warrant.

The Fourth Amendment of the United States Constitution and Delaware Constitution protects against "unreasonable searches and seizures."[67] A warrantless search is deemed unreasonable unless that search falls within a recognized exception.[68] If a search proceeds without a warrant, the State must prove by a preponderance of evidence that the search fell within an established exception to the warrant requirement.[69] A compelled physical intrusion beneath the skin to obtain a blood sample for use as evidence in a criminal investigation is considered a search."[70]

---

[66] *Stansbury*, 511 U.S. at 323.
[67] U.S. CONST. amend. IV; Del. CONST. art. I, § 6.
[68]*Katz v. United States*, 389 U.S. 347, 357 (1967); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Higgins v. State*, 89 A.3d 477, *2 (Del. 2014).
[69]*Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013); *Schneckloth*, 412 U.S. at 222; *Scott v. State*, 672 A.2d 550, 552 (Del. 1996).
[70] *McNeely*, 133 S. Ct. at 1558.

One recognized exception to a warrantless search is a search conducted with a person's voluntary consent.[71] "To be deemed 'voluntary,' consent need not be 'knowing and intelligent,' but it cannot be the product of coercion by threat or force."[72]

To determine whether consent was given voluntarily, the Court must examine "the totality of the circumstances surrounding the consent" including: (1) knowledge of the constitutional right to refuse consent; (2) age, intelligence, education, and language ability; (3) the degree to which the individual cooperates with police; and (4) the length of detention and the nature of questioning, including the use of physical punishment or other coercive police behavior.[73]

It is undisputed that Mauk signed the Consent Form to have her blood drawn. Mauk argues that her ability to consent was hampered because was under the influence of both alcohol and the pain medication at the time the Consent Form was signed and during the blood draw. She further claims that Cpl. Mauchin coerced her into consenting to the blood draw by threatening to get a warrant if she did not consent.

Here, the totality of the circumstances establishes that Mauk voluntarily consented to the blood draw. Cpl. Mauchin explained to Mauk that she could either

---

[71] *Schneckloth*, 412 U.S. at 221–22; *Scott*, 672 A.2d at 552; *Higgins*, 89 A.3d at *2.
[72] *Higgins*, 89 A.3d at *2 (quoting *Schneckloth*, 412 U.S. at 241, 233).
[73] *Cooke v. State*, 977 A.2d 803, 855 (Del.2009).

consent to the blood draw or he could obtain a search warrant to do so. Outside the presence of Cpl. Mauchin, Mauk had the opportunity to discuss the Consent Form with her significant other. The language of the Consent Form makes clear that she was providing consent for police purposes. Neither Mauk's age, intelligence, nor education precluded her voluntary consent. In fact, given Mauk's previous DUI convictions, she was not "an ignorant newcomer to the law."[74]

During Cpl. Mauchin's discussions with Mauk, she was cooperative. Although Mauk became upset when she learned that the other vehicle driver was not going to have his blood drawn, Mauk never withdrew consent and remained relaxed during the blood draw.[75] Cpl. Mauchin estimated that his interaction with Mauk lasted approximately 35 minutes from first contact to a few minutes after the blood draw. During this time, Mauk was not handcuffed and Cpl. Mauchin was the only trooper present.

Under Delaware law, "'[t]he mere fact that one has taken drugs does not render consent involuntary,' nor does intoxication 'render a confession involuntary.'"[76] "[T]he use of drugs is just one factor the court must consider while looking at the totality of the circumstances to decide if a statement is 'the product

---

[74] *See Higgins*, 89 A.3d at *2 (explaining that the defendant who had previously been arrested for a similar offense was not a newcomer to the law).

[75] *Id.*

[76] *Pustolski*, No. 0903005777, slip op. at 19 (quoting *State v. Caldwell*, 2007 WL 1748663, *3 (Del. Super. May 17, 2007)).

of an essentially free and unconstrained choice.'"[77] The relevant inquiry is whether the person consenting "knew what she was doing and had a reasonable appreciation of the nature and significance of his or her actions."[78]

The record indicates that Mauk "seemed to be groggy," but understood and was able to answer the questions posed to her. Cpl. Mauchin asked Mauk a series of questions relating to the collision and Mauk was able to tell Cpl. Mauchin that she was turning left on a solid green light and was hit. Mauk also recalled the events leading up to the collision. The fact that she was concerned that the other driver's blood was not being drawn indicates that she understood the meaning and implications of her own consent.

With regard to Mauk's argument that Cpl. Mauchin coerced her into consenting to the blood draw, while this Court has in invalidated consent when officers unlawfully claimed to possess a warrant,[79] "Fourth Amendment jurisprudence does not forbid a law enforcement officer from attempting to persuade an individual to consent to a search."[80] In this case, Cpl. Mauchin did not dishonestly claim to possess a warrant, but only informed Mauk of his lawful intentions if she refused to consent.

---

[77] *Id.*

[78] *Id.*

[79] *Cooke v. State*, 977 A.2d 803, 857 (Del. 2009) (distinguishing cases in which consent to search was invalidated when searching officers represented they had a warrant, when in fact, none exist).

[80] *Higgins*, 89 A.3d at *3 (citing *Schneckloth*, 412 U.S. at 233).

Because the Court has found that Mauk voluntarily consented to the blood draw, the Court will not address the question of whether probable cause or exigent circumstances existed.[81]

## VI.  CONCLUSION

For the foregoing reasons, Defendant's Motions to Suppress are **DENIED**.

**IT IS SO ORDERED.**

_____

Jan R. Jurden, Judge

---

[81] *See Missouri v. McNeely*, 133 S.Ct. 1552 (2013); *Schmerber v. California*, 384 U.S. 757 (1966).